# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| **IN RE MERCER ADVISORS DATA SECURITY LITIGATION** | **Case No. 26-cv-00842-SKC-TPO**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs PAUL BERGER, PAUL BERGER REVOCABLE TRUST, JOHN AMICK, CHRISTINE MOSES, and STACY JOHNSON (collectively "Plaintiffs"), by and through their undersigned counsel, on behalf of themselves and a class of all other similarly situated persons, file this Consolidated Class Action Complaint against Mercer Advisors, Inc. and Mercer Global Advisors, Inc., (together, "Mercer" or "Defendants"). Plaintiffs' allegations are made based upon personal knowledge, their own acts, and upon information and belief and investigation of counsel, as to all other matters.

## I.  NATURE OF THE ACTION

1.     Plaintiffs bring this action against Mercer for its failure to properly secure and safeguard highly valuable, protected, personally identifiable information and for its failure to comply with industry standards to protect information systems that contain and/or are utilized to transfer the personal information of Plaintiffs and Class members. Plaintiffs have been, and continue to be, harmed as a result of Mercer's failure to properly secure and safeguard its customers' highly valuable,

protected, personally identifiable information including, *inter alia*, names, contact information, full or partial Social Security numbers, emergency contact details, contract documents, legal documents, and other personally identifiable information (collectively, "PII" or "Personal Information"); and for its failure to comply with industry standards to protect information systems that contain PII.

2.      Mercer is a national wealth management and investment advisory firm that collects, stores, and maintains highly sensitive personal and financial information from its clients as part of providing ongoing financial planning and advisory services.

3.      On or about February 16, 2026, an extortion-oriented cybercrime group known as ShinyHunters claimed responsibility for an unauthorized intrusion into systems associated with Mercer (the "Data Breach"), asserting that it had accessed and exfiltrated over 5 million records belonging to the firms' clients and internal operations.[1]

4.      The group issued a 48-hour ultimatum to Mercer, threatening to leak the records it had stolen if Mercer refused to pay a ransom; warning Mercer to "[m]ake the right decision, don't be the next headline."[2]

---

[1] Paulina Okunytė, *Barron's top investment advisors threatened with 48-hour ultimatum "don't be the next headline,"* Cybernews (Feb. 17, 2026) *available at* https://cybernews.com/security/shinyhunters-mercer-beacon-ria-breach/.

[2] *Id.*

5.      In its ultimatum, ShinyHunters characterized the exfiltrated information as highly sensitive and implied that disclosure of the information would imminently expose individual clients and internal corporate documents to unauthorized third parties, thereby substantially increasing the risk that any person whose information was included in the dataset would suffer identity theft, fraud, or other misuse of their personal and financial information.

6.      When its demands were not met, ShinyHunters published the records to the dark web. According to independent reporting that analyzed the leaked datasets, the Data Breach involved approximately 5.7 million individual records containing names, contact information, full or partial Social Security numbers, emergency contact details, contract documents, legal documents, and other Personal Information that was routinely collected and maintained by Mercer.[3]

7.      This result was not inevitable. Other similar financial institutions, when faced with a ShinyHunters attack, were able to prevent or minimize harm to their customers.

---

[3] Paulina Okunytė, *ShinyHunters reveals +5M records after Wall Street ignores "final warning,"* Cybernews (Feb. 23, 2026), *available at* https://cybernews.com/security/shinyhunters-mercer-beacon-data-breach/. In the article, Cybernews posted screenshots of the Mercer data leaked on the dark web and reported that the Cybernews research team had investigated the leaked Mercer dataset, and discovered that it consists of Mercer's clients' data, including, but not limited to full names, contact information, and Social Security numbers, and that in total, Mercer's data leaked on the dark web is 5GB in size.

8.     As a direct result of the unauthorized access and disclosure of Plaintiffs' and Class members' personal and financial information, those individuals are now at a heightened risk of identity theft, financial fraud, phishing, and other harms, thereby causing substantial and ongoing damages.

9.     Plaintiffs bring claims for negligence, negligence *per se,* unjust enrichment, breach of implied contract, and statutory violations, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the PII in Mercer's possession to prevent incidents like the Data Breach from recurring in the future.

## II.  PARTIES

### Plaintiffs

10.     Plaintiff Paul Berger, at all relevant times, is a citizen and resident of the District of Columbia.

11.     Plaintiff Paul Berger Revocable Trust is a trust, of which Plaintiff Berger is sole trustee.

12.     Plaintiff John Amick, at all relevant times, is a citizen and resident of San Diego, California.

13.     Plaintiff Christine Moses, at all relevant times, is a citizen and resident of Buncombe County, North Carolina.

14.     Plaintiff Stacy Johnson, at all relevant times, is a citizen and resident of the State of California.

4

**Defendants**

15. Defendant Mercer Advisors, Inc. is a corporation organized and existing under the laws of Delaware that maintains its principal place of business at 1200 17th Street, Suite 2000, Denver, Colorado.

16. Defendant Mercer Global Advisors, Inc. is a wholly-owned subsidiary of Mercer Advisors, Inc. It is also a corporation organized and existing under the laws of Delaware that maintains its principal place of business at 1200 17th Street, Suite 2000, Denver, Colorado. In its Form SDV Part 2A, Mercer Global Advisors Inc. represents that it "is registered with the SEC and delivers all investment-related services. Mercer Advisors Inc. is the parent company of Mercer Global Advisors Inc. and is not involved with investment services." In its Form SDV Part 2A, Mercer Global Advisors Inc. also represents that "As of December 31, 2025, the firm provided discretionary investment management services on assets of $82.9 billion and non-discretionary advisory services on assets of $1.4 billion." Additionally, in its Form SDV Part 2A, Mercer Global Advisors Inc. represents that "Mercer Advisors" is a brand name used by several affiliated legal entities owned by Mercer Advisors, Inc., including Mercer Global Advisors Inc., an SEC registered investment adviser providing investment advisory and family office services; Mercer Advisors Private Asset Management, Inc., an SEC registered investment adviser providing discretionary investment management services to affiliated private funds; Mercer Advisors Tax Services, LLC, a tax services and accounting firm; Heim, Young and

Associates, Inc., a broker-dealer, member FINRA/SIPC; and Mercer Advisors Insurance Services, LLC, an insurance agency.

### III. JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Mercer.

18.    This Court has personal jurisdiction over Mercer because Mercer maintains its principal place of business in this District, and a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

19.    Venue is proper under 28 U.S.C. § 1391(a)(2), (b)(1)-(3), and (c)(2) because Mercer's principal place of business is located in this District, Mercer conducts substantial business in this District, and a substantial part of the events giving rise to the claims emanated from activities within this District.

### IV.  FACTUAL ALLEGATIONS

#### A. Mercer's Business

20.    Mercer is a national wealth management and financial planning firm specializing in financial planning, investment management, tax planning and preparation, estate planning, insurance solutions, trustee services, retirement

planning, family office services, private markets investing, and wealth management.[4]

21.     In the ordinary course of its business, Mercer collects and maintains the PII of its current and former customers, including but not limited to:

| Contact Information | • Full legal name<br>• Email address<br>• Mailing address and physical address (if different)<br>• Preferred phone number, Identification Data |
| --- | --- |
| Identification Data | • Social Security Number or Tax Identification Number<br>• State or local identification card number<br>• Date of birth |
| Profile Information | • Login credentials to establish access to our client portal<br>• Investment risk tolerance, preferences, and objectives<br>• Biographical details (e.g., education, employer), Interests (e.g., boating, skiing, traveling)<br>• Login credentials to review other accounts, if permitted by client<br>• Family member data provided by client (e.g., family members' name, gender, age, and date of birth)<br>• Estate plan documents |
| Financial Data | • Income<br>• Economic status (*e.g.*, high-net-worth)<br>• Tax status<br>• Tax returns<br>• Financial account details provided by client<br>• Investment holdings<br>• Account balances and contributions |

---

[4] InvestmentNews, Companies, Mercer Advisors, *available at* https://www.investmentnews.com/companies/mercer-advisors/265050?utm.

7

| | • Asset levels and ability to invest |
|---|---|
| Marketing Data | • Preferences regarding communication about our services, events, and publications |
| Payment Data | • Credit card information<br>• Billing information.[5] |

22.    Mercer made promises and representations to Plaintiffs and Class members that the PII it solicited and collected from them would be kept safe and confidential, assuring Plaintiffs and Class members that "Mercer Advisors employs technical, organizational, and physical safeguards designed to protect the personal information we collect."[6]

23.    By virtue of its role as a financial-services firm and in light of these representations, Mercer owed Plaintiffs and Class members a duty to exercise reasonable care in collecting, storing, and using their PII, and to maintain appropriate data security safeguards consistent with industry standards, regulatory guidance, and common-law obligations. Plaintiffs and Class members had a reasonable expectation that Mercer would comply with its obligations related to their PII.

24.    Mercer failed to comply with its obligations, resulting in the Data Breach.

---

[5] Mercer, Privacy Policy Effective as of February 10, 2023, *available at* https://www.merceradvisors.com/privacy-policy/

[6] *Id.*

**B. Mercer Obtains, Collects, Stores, Uses, and Derives a Benefit from the PII of Plaintiffs and Class Members.**

25.    Mercer acquires, collects, and stores a significant amount of PII belonging to Plaintiffs and Class members. Mercer uses this PII to provide goods and services, making a profit therefrom. Mercer would not be able to obtain revenue if not for the acceptance and use of this PII.

26.    As a condition of utilizing or purchasing Mercer's products and services and/or their employment with Mercer, Plaintiffs and Class members were required to entrust their highly sensitive PII to Mercer.

27.    By collecting and obtaining Plaintiffs' and the Class members' PII, either directly or indirectly, Mercer assumed legal and equitable duties to Plaintiffs and the Class members to protect and safeguard their PII from unauthorized access and intrusion.

28.    Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Mercer absent a commitment to safeguard that information.

29.    Defendants recognize this duty in their respective Privacy Policies and marketing to customers and employees.

30.    Mercer's assurances of maintaining high standards of cybersecurity demonstrates that it recognizes that it has a duty to use reasonable measures to protect the PII it collects and maintains.

9

31.     Plaintiffs and Class members relied on Mercer to keep their PII confidential and securely maintained, to use their PII for business purposes only, and to make only authorized disclosures of their PII. The Data Breach occurred because Mercer failed to honor its commitments.

32.     Mercer violated its explicit privacy representations and failed to adopt reasonable and appropriate security practices and procedures, including administrative, physical security, and technical controls, to safeguard Plaintiffs' and Class members' PII.

33.     As a result, Plaintiffs' and Class members' PII was accessed and stolen from Defendants' inadequately secured data systems in a massive and preventable Data Breach

### C. The Data Breach

34.     On or about February 16, 2025, Mercer suffered a cyber extortion attack by a notorious group of hackers using the online moniker "ShinyHunters." The Data Breach compromised 5.7 million individual records including records containing Plaintiffs' and Class members' sensitive PII.[7]

35.     ShinyHunters has been linked to several of the largest data breaches in history, and the group's "pay or leak" reputation involves demanding

---

[7] Paulina Okunytė, *ShinyHunters reveals +5M records after Wall Street ignores "final warning,"* Cybernews (Feb. 23, 2026), *available at* https://cybernews.com/security/shinyhunters-mercer-beacon-data-breach/

multimillion-dollar ransoms in cryptocurrency, with the threat of public data dumps on their dedicated leak site if negotiations fail.

36.     The group's extortion tactics often escalate quickly and with real-world consequences, such as swatting attacks (the malicious act of falsely reporting an emergency to trigger a law enforcement response),  and the dissemination of threats of physical violence to coerce payment. In a notable escalation of these "terror" tactics, ShinyHunters has been observed publishing lists of federal employees accompanied by explicit threats of murder.[8]

37.     After obtaining the records, the attackers attempted to extort Mercer to pay a ransom by threatening to disclose the information.

38.     When Mercer refused to comply with the ransom demand, ShinyHunters released the documents publicly on the dark web on or about February 18, 2026.

39.     Class members now face the threat of years of potential phishing and extortion attempts. For example, by linking the stolen PII with other public and non-public information, cybercriminals can create highly convincing phishing emails, including messages that impersonate Mercer support and reference specific account information to gain trust.

---

[8] Allison Nixon, *Harassment, Scare Tactics, & Why Victims Should Never Pay ShinyHunters*, Unit2218 (Feb. 2. 2026), *available at* https://blog.unit221b.com/dont-read-this-blog/harassment-scare-tactics-why-victims-should-never-pay-shinyhunters

40.     These and other threats resulting from the Data Breach will now require Plaintiffs to engage in ongoing and constant monitoring of their financial and personal records.

### D. The Value of Private Information and Effects of Unauthorized Disclosure

41.     Mercer was well aware that the protected PII which it acquires is highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

42.     Mercer also knew that a breach of its computer systems, and exposure of the PII therein, would result in the increased risk of identity theft and fraud by the individuals whose PII was compromised.

43.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[9] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[10]

---

[9] 17 C.F.R. § 248.201 (2013).

[10] *Id.*

12

44.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.

45.    Numerous sources cite dark web pricing for stolen identity credentials.[11] For example, Private Information can be sold at prices ranging from $40 to $200.[12] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[13]

46.    Identity thieves use stolen Private Information for a variety of crimes, including credit card fraud, phone or utilities fraud, extortion, and bank/finance fraud.

47.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

48.    Victims of identity theft also often suffer embarrassment, extortion, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

---

[11] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[12] Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[13] *In the Dark*, VPNOverview (2019), *available at* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

49.    Moreover, the fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

50.    When combined with other publicly available data, any PII element can be used to build full identity profiles, known as "Fullz" packages, which are frequently exploited in financial fraud schemes. "Fullz" is fraudster-speak for data that includes a victim's information, including name, address, SSN, date of birth, and more.

51.    With Fullz packages, cybercriminals can cross-reference two (or more) sources of PII to marry unregulated data available elsewhere (*e.g.*, address or phone number) to criminally stolen data to assemble shockingly accurate and complete dossiers on individuals.

52.    Compromised PII, whether alone or as part of a Fullz package, is highly valuable to cybercriminals, who can use it to engage in a wide range of fraudulent

---

[14] Report to Congressional Requesters at 29, United States Government Accountability Office (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf

activities, including committing unemployment insurance fraud, opening unauthorized financial accounts, and applying for government benefits.

53. This type of identity theft renders any compromised data—including seemingly innocuous PII, such as name and contact information—valuable. In the wrong hands, up-to-date names, addresses, phone numbers, and email addresses can be used to update, validate, and verify Fullz packages, which can then be used for nefarious purposes.

54. For example, a criminal actor can use an up-to-date Fullz package to bypass identity verification tools—which are often used in financial transactions (like loan applications), background checks, etc.—without detection. In a typical identity verification system, a user submits their PII, like their name, addresses, or date of birth. That customer-submitted PII is then cross-checked against "a trusted data set," including those from "credit bureaus, official government documents or mobile operator databases."

55. Thus, with an up-to-date Fullz package—which might include seemingly harmless information, like the identity theft victim's name and current address—a cybercriminal has the victim's up-to-date PII, which will match the victim's information from trusted data sources, like the credit bureaus. With this information, the criminal can then successfully pass identity verification systems without raising any red flags. In this way, Fullz packages, which are made possible

15

by up-to-date and compromised elements of PII, enable fraudsters to carry out various forms of identity theft, including taking out fraudulent loans.

56.    Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

### E.  Data Breaches are Foreseeable and ShinyHunters is a Notorious Hacking Group that Employs Commonly Known Techniques

57.    ShinyHunters is a notorious cybercriminal group that became widely known in 2020, gaining attention with high-profile data breaches.[15] [16]

58.    ShinyHunters was first widely known for selling 91 million user records from the Indonesian e-commerce platform Tokopedia on the dark web.[17] According to Forbes, "[i]n just the first two weeks of May 2020, a hacker, known only as ShinyHunters, offered an astonishing 200 million stolen data records for sale on the dark web. Not repurposed data from old breaches, but fresh to the market and,

---

[15] Lily Hay Newman, *ShinyHunters Is a Hacking Group on a Data Breach Spree*, WIRED (May 21, 2020), *available at* https://www.wired.com/story/shinyhunters-hacking-group-data-breach-spree/.

[16] *ShinyHunters, One of the Most Recognized Threat Actors Among the Hacking Community*, WhiteBlueOcean (Feb. 16, 2021), *available at* https://www.whiteblueocean.com/newsroom/shinyhunters-one-of-the-most-recognised-threat-actors-among-the-hacking-community/.

[17] BugCrowd Glossary ShinyHunters (2026), *available at* https://www.bugcrowd.com/glossary/shinyhunters/.

therefore, very valuable. The surprising thing is that, until then, nobody had even heard of ShinyHunters."[18]

59.    In 2020 alone, ShinyHunters sold the following data batches on the dark web:[19]

- Vakina.com.br — 4.8 million records

- Truefire.com — 600,000 records

- Havenly.com — 1.3 million records

- Drizly.com  — 2.4 million records

- Proctoru.com — 444,000 records

- Scentbird.com — 5.8 million records

- Appen.com — 5.8 million

- Homechef.com — 8 million records

- Chatbooks.com — 15 million records

60.    Since then, ShinyHunters has gained even more notoriety for targeting companies across various sectors, including technology, education, media, and e-commerce, accumulating a significant track record of damaging data breaches.

---

[18] Davey Winder, *Hacker Gives Away 386 Million Stolen Records on Dark Web—What You Need To Do Now*, Forbes (July 29, 2020), *available at* https://www.forbes.com/sites/daveywinder/2020/07/29/hacker-gives-away-386-million-stolen-records-on-dark-web-what-you-need-to-do-now-shinyhunters-data-breach/.

[19] *ShinyHunters Offers Stolen Data on Dark Web*, DarkReading (July 28, 2020), *available at* https://www.darkreading.com/cyberattacks-data-breaches/shinyhunters-offers-stolen-data-on-dark-web.

61.    ShinyHunters is known for its financially motivated operations, primarily involving the theft and sale of data. They have compromised several companies, such as PowerSchool, Pixlr, NitroPDF, and MeetMindful, often leaking the stolen data on hacking forums either for free or for sale.

62.    ShinyHunters aims to collect massive amounts of PII and PHI and has disseminated data for sale through a variety of dark web forums. These forums have, at times, been shut down by the FBI, only to reemerge with a different dark web address.[20]

63.    ShinyHunters is known for targeting companies with large user bases, like Mercer. The group exfiltrates data from these organizations and extorts data breach victims to pay exorbitant sums or risk their data being sold on the dark web.

64.    ShinyHunters has targeted well-known platforms and services, typically those with weaker security measures, large user databases, or high-profile reputations.

65.    In some instances, ShinyHunters engages in ransom-based attacks, demanding payments to avoid leaking stolen data. Unlike other groups that specialize in ransomware or advanced persistent threat tactics, ShinyHunters focuses on maximizing the volume of data they acquire and monetize.

---

[20] Jai Vijayan, *Leak Site BreachForums Springs Back to Life Weeks After FBI Takedown*, DarkReading (May 29, 2024), *available at* https://www.darkreading.com/cyberattacks-data-breaches/leak-site-breachforums-springs-back-to-life-weeks-after-fbi-takedown.

66.    According to Skyhigh Security,[21] the typical ShinyHunters modus operandi includes:

- **Orchestrating deception campaigns** by deploying sophisticated phishing schemes that aim to lure victims with fraudulent emails to capture login credentials.

- **Targeting unsecured cloud storage** to capitalize on poorly protected online storage data, which is akin to raiding unguarded digital vaults.

- **Infiltrating and compromising web platforms and development tools,** often purloining login details or application programming interface (API) keys to pilfer valuable data.

- **Probing GitHub repositories** to scrutinize company code repositories for exploitable flaws, potentially granting unauthorized database access.

- **Monetizing via covert networks** to profit by trading stolen data on obscure internet marketplaces, catering to buyer seeking illicit information.

67.    ShinyHunters also has a history of actually using the data it acquires, not just selling or threatening to sell it. For example, after ShinyHunters hacked Ticketmaster, the group announced that it possessed barcodes for entry to Taylor Swift's Eras tour and "an additional 30 million barcodes for other high-profile concerts and sporting events."[22]

---

[21] Rodman Ramezanian, *Ticketmaster's Encore: How "ShinyHunters" Hacked the Show*, Skyhigh Security (Jul. 11, 2024), *available at* https://www.skyhighsecurity.com/about/resources/intelligence-digest/ticketmasters-encore-how-shinyhunters-hacked-the-show.html.

[22] Nick Robins-Early, *Hackers leak alleged Taylor Swift ticket data to extort Ticketmaster*, The Guardian (Jul. 5, 2024), *available at* https://www.theguardian.com/us-news/article/2024/jul/05/taylor-swift-eras-tour-ticketmaster-hack-ransom.

68.    ShinyHunters often targets applications with weak API security, including applications that lack multifactor authentication or rate-limiting. By exploiting these weaknesses, they can access sensitive data through exposed API endpoints. Once they gain access to an organization's database, ShinyHunters uses APIs to retrieve sensitive data in bulk.

69.    ShinyHunters is active on the dark web, where the group lists data breaches for sale. It typically offers "exclusive" sales, where only one buyer receives the dataset, or "multi-buy" options, where the dataset is sold to several buyers. The group has carefully cultivated a reputation on forums, which makes buyers more likely to trust and purchase its listings. The group provides "sample" data from breaches to verify authenticity, encouraging purchases by demonstrating the quality of data.

70.    ShinyHunters also occasionally "leaks" data in a staged manner to maximize pressure on victims. The group sometimes releases partial data as a warning, then gives targets a chance to pay before the full release.

71.    ShinyHunters has listed data for sale on the dark web even if a ransom is paid. For example, ShinyHunters hacked AT&T in April 2024, obtaining some 86 million customer records, including customers' SSNs, mailing addresses, and dates of birth.[23] It was reported in July 2024 that AT&T paid ShinyHunters around

---

[23] Christianna Silva, *Hackers leak 86 million AT&T customer records with 44 million social security numbers, report says*, Mashable (Jun. 6, 2025), *available at* https://mashable.com/article/leaked-att-customer-record-social-security-numbers.

$370,000 to delete this data.[24] Despite this ransom payment, this data was re-packaged and re-uploaded to a popular Russian cybercrime forum in 2025.[25]

72.    ShinyHunters often begins by searching for companies using Microsoft Office 365 and third parties that store GitHub open authorizations tokens.[26] The group then identifies research, development, and other employees with broad access to data in the organizations. ShinyHunters also has a history of attacking developer repositories to steal credentials or API keys.[27]

73.    In sum, ShinyHunters is a notorious, decentralized hacking group whose tactics are well-known and foreseeable.

**F.  Data Breaches are Preventable**

74.    Despite the growing body of publicly available information regarding the rise of ransomware attacks, phishing and "vishing" (voice phishing where attackers use phone calls or voice messages to manipulate individuals into disclosing sensitive

---

[24] Kim Zetter, *AT&T Paid a Hacker $370,000 to Delete Stolen Phone Records*, WIRED (Jul. 14, 2024), *available at* https://www.wired.com/story/atandt-paid-hacker-300000-to-delete-stolen-call-records/.

[25] Chris Riotta, *AT&T Hit by Massive Reported Identity Data Leak – Again*, Bank Info Security (Jun. 5, 2025), *available at* https://www.bankinfosecurity.com/att-hit-by-massive-reported-identity-data-leak-again-a-28595.

[26] *Researchers Share Common Tactics of ShinHunters Threat Group*, DarkReading (Aug. 24, 2021), *available at* https://www.darkreading.com/cyberattacks-data-breaches/researchers-share-common-tactics-of-shinyhunters-threat-group.

[27] Ravie Lakshmanan, *Researchers Detail Modus Operandi of ShinyHunters Cyber Crime Group*, The Hacker News (Aug. 23, 2021), *available at* https://thehackernews.com/2021/08/researchers-detail-modus-operandi-of.html.

information) schemes, and other forms of cyberattacks that compromise PII, Defendants' approach to maintaining the privacy of Plaintiffs' and Class members' PII was inadequate, unreasonable, negligent, and reckless. Mercer failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Mercer was maintaining for Plaintiffs and Class members such as encrypting the information or deleting it when no longer needed, limiting employee access keys to PII, and adequately training its employees concerning cyber and ransomware attacks, which caused the exposure of Plaintiffs' and Class members' PII.

75.    As explained by the FBI, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[28]

76.    Mercer could have prevented this Data Breach. It could have and should have implemented measures—as recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- **Enable strong spam filters** to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and

[28] Ransomware Prevention and Response, United States Federal Bureau of Investigation, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[29]

77.    To prevent and detect cyberattacks and ransomware attacks, Mercer could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
  - Remove privileged credentials

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
  - Ensure collaboration among security operations, security admins, and information technology admins to configure servers and other endpoints securely

- **Build credential hygiene**
  - Use multifactor authentication or network level authentication and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall

---

[29] *Id.*

-    Enable tamper protection
-    Enable cloud-delivered protection
-    Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications.[30]

78.    Similarly, Mercer could and should have implemented measures—also recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers.

- Keep only what you need for your business.

- Protect the information that you keep.

- Properly dispose of information you no longer need. Create a plan to respond to security incidents.[31]

79.    Finally, Mercer could and should have implemented the following measures—also recommended by the U.S. Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions**. Prioritize timely patching of internet-facing servers that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities.

---

[30] *See Human-operated ransomware attacks: A preventable disaster,* Microsoft Security (Mar. 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[31] *See Protecting Personal Information: A Guide for Business,* Federal Trade Commission (Oct. 2016), *available at* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

- **Limit the use of RDP and other remote desktop services**. If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured and security features are enabled**. For example, disable ports and protocols not being used for business purposes.[32]

80.    Because Mercer was collecting, storing, and transferring highly sensitive PII belonging to Plaintiffs and Class members, it could—and should—have implemented all of the above measures to prevent and detect cyberattacks.

81.    The occurrence of the Data Breach indicates that Mercer failed to adequately implement one or more of the above measures to prevent cyberattacks such as the attack resulting in the Data Breach and data thieves accessing and acquiring the PII of Plaintiffs and millions of Class members.

**G. Mercer Failed to Comply with FTC Guidelines and Industry Best Practices**

82.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be a factor in all business decision-making.

---

[32] *See #StopRansomware Guide*, Cybersecurity and Infrastructure Security Agency, (Oct. 19, 2023), *available at* https://www.cisa.gov/resources-tools/resources/stopransomware-guide.

83.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[33] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[34]

84.    The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[33] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), *available at* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[34] *Id.*

85.    The FTC also directs businesses to provide immediate notification to individuals impacted by a data breach so that those impacted can take measures to protect themselves.

86.    Here, Mercer has acted inexcusably by failing to provide timely notice to the individuals whose personal information was compromised in the Data Breach, despite its knowledge of the incident and its obligations to safeguard such information.

87.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

88.    Mercer failed to properly implement the kind of basic data security practices that have led to successful FTC enforcement actions for violating Section 5 of the FTCA.

89.    Mercer's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

28

90.    Mercer was at all times fully aware of its obligation to protect the Private Information of consumers, including Plaintiffs and Class members. Mercer was also aware of the significant repercussions that would result from its failure to do so.

**H. Mercer Failed to Comply with Regulations under GLBA.**

91.    Mercer is a Registered Investment Adviser ("RIA")—a firm that provides personalized investment advice and portfolio monitoring for a fee, while acting as a fiduciary.[35]

92.    Mercer touts itself as the country's "#1 RIA" for wealth management."[36]

93.    As an RIA, Mercer is regulated by the Security and Exchange Commission ("SEC").

94.    In addition to the FTC guidelines and FBI recommendations discussed above, Mercer is subject to additional SEC requirements relating to proper data handling, promulgated pursuant to the Gramm-Leach-Bliley Act ("GLBA") 15 U.S.C. § 6801, *et seq*.

---

[35] *See Investment Advisers*, FINRA, *available at* https://www.finra.org/investors/investing/working-with-investment-professional/investment-advisers

[36] *See* Baron's, *Mercer Advisors Named #1 RIA Firm by Barron's for Second Consecutive Year* (Sept. 12, 2025), *available at* https://www.merceradvisors.com/awards-news/awards/mercer-advisors-named-1-ria-firm-by-barrons-for-second-consecutive-year/

29

95.    To protect investors and maintain market integrity, the SEC has imposed strict cybersecurity compliance rules for certain financial institutions. Among these is Regulation S-P.[37]

96.    Regulation S-P is a rule established by the SEC, governing how financial institutions, including RIAs, handle sensitive costumer information. Also called the Privacy of Consumer Financial Information Rule, it is designed to protect private client data against unauthorized access, misuse, and theft.[38]

97.    Among other things, Regulation S-P requires financial institutions to:

- send clients privacy notices explaining their information-sharing practices;

- provide customers with an opt-out mechanism for certain disclosures, limiting the sharing of their personal information to non-affiliated third parties;

- implement written policies and procedures to safeguard private client records and information; and

- establish procedures for the proper disposal of consumer report information.

---

[37] *See Investment News, How RIAs can strengthen cybersecurity compliance,* GoIRA (Aug. 19, 2025), *available at* https://www.investmentnews.com/goria/technology/how-rias-can-strengthen-cybersecurity-compliance/261775.

[38] *Id.*

98.     Specifically, as a reaction to the spate of cyberattacks on RIAs, in May 2024, the SEC finalized the changes to Regulation S-P.  According to the SEC, these updates are designed to "modernize and enhance the protection of consumer financial information."[39]

99.     These changes have major implications on cybersecurity compliance for RIAs like Mercer.

100.    First, RIAs must develop and maintain written policies and procedures for an incident response plan. The program must be "reasonably designed to detect, respond to, and recover from unauthorized access to or use of customer information." The program must also have these core elements: (1) assessment of incidents involving unauthorized access to client data, (2) measures to contain the data breach, and (3) steps for notifying clients if their private information is compromised.

101.    Further, RIAs must notify individuals "whose sensitive customer information was, or is reasonably likely to have been, accessed, or used without authorization." RIAs must notify affected clients of the data breach within 30 days after it was first detected, unless a waiver applies. The notifications must include:

> (1) the nature and date of the incident;
>
> (2) the type of sensitive customer information breached; and,
>
> (3) the firm's contact information.

---

[39] *Id.*

102.    As a larger RIA (with assets under management of over \$1.5 billion), Mercer's compliance date for the amended rule was December 2025. Accordingly, Mercer was subject to these requirements both before, during, and after the February Data Breach.[40]

103.    In an *Investment News* article discussing the rule, one expert noted that "The SEC is done with handshake agreements and informal procedures – they want everything documented and provable. . .  Here's the kicker: you can outsource IT tasks, but you can't outsource liability. Your cloud provider's security failure becomes your compliance nightmare."[41]

104.    In addition to Regulation S-P, RIAs have to comply with additional SEC rules to protect advisors and ensure that RIAs are prepared to address cybersecurity threats.

105.    SEC Rule 206(4)-7, also known as the Investment Adviser Compliance Program Rule, requires RIAs to develop and maintain written compliance policies and procedures. These include measures to protect client data and prevent cyber breaches.

106.    Regulation S-ID, also known as the Identity Theft Red Flags Rule, requires RIA firms to develop and implement a program to detect, prevent, and mitigate identity theft. Rule 201, in particular, states that firms must implement an

---

[40] *Id.*

[41] *Id.*

identity theft prevention program (ITPP) related to the opening or maintenance of covered accounts.

107.    Mercer failed to adequately implement the requirements of these SEC regulations. First, Mercer's response program was not "reasonably designed to detect, respond to, and recover from unauthorized access to or use of customer information."

108.    In an industry article following several breaches on RIAs, including Mercer, other RIAs explained that their customer information, although accessed, was not compromised. A spokesman for Ameriprise said: "[w]e recently experienced an incident involving unauthorized access to certain stored data and files. We blocked the unauthorized access, and outside forensic experts have confirmed this. Importantly, there has been no disruption to business operations, and clients and advisors have secure access to our systems and sites. In any instance when personally identifiable information (PII) is impacted, we would provide notice in keeping with our regulatory responsibilities. We're confident that the PII of the individual who filed the suit was not impacted."[42]

109.    In the same article, an industry analyst unfavorably compared Mercer's performance to its peers who were affected by similar breaches but who managed to largely protect their customers' information: "You have some companies that have been attacked, didn't pay the ransom and all of their information was released, and

---

[42] *Hightower knocks 'baseless' lawsuit as cyberattacks spread across RIAs*, Investment News (Apr. 2, 2026), *available at* https://www.investmentnews.com/ria-news/hightower-knocks-baseless-lawsuit-as-cyberattacks-spread-across-rias/265991.

there are other companies that have put out public statements saying we were the victim of an attack, but it only affected .5% of our customers. . . I interpret that as showing the efficacy of some of their internal cybersecurity risk management controls, whereas some of the others that were more widely impacted, seems like maybe there's something that they need to revisit there."[43]

## I. Mercer Failed to Comply with Industry Standards

110. As shown above, Mercer owed a duty of care to Plaintiffs and Class members to provide reasonable security, consistent with industry standards, to ensure that its systems and networks adequately protected their PII.

111. Several best practices have been identified that at a minimum should be implemented by financial service providers like Mercer, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

112. Other best cybersecurity practices that are standard in the financial industry include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and

---

[43] *Id.*

protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

113.   Despite the sensitivity of the PII and the heightened risk profile of wealth-management clients, Mercer's data-security measures were insufficient to prevent or promptly detect the ShinyHunters attack. Mercer failed to adopt, implement, and maintain reasonable security practices, including but not limited to:

- Adequate network segmentation;

- Robust access controls and least-privilege permissions;

- Timely patching and remediation of known vulnerabilities;

- Multi-factor authentication and credential-protection measures;

- Encryption of PII at rest and in transit;

- Effective intrusion-detection and logging; and

- Regular security audits and risk assessments.

**J. Mercer Breached a Duty of Care Owed to Plaintiffs and Class Members Resulting in Injury.**

114.   Plaintiffs' and Class members' PII was stored Mercer's platforms, networks, systems or products at the time of the Data Breach.

115.   Mercer owed common law duties to Plaintiffs and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, accessed, stolen, or misused by unauthorized parties.

116.    At the time of the Data Breach, Mercer failed to maintain reasonable data security measures and comply with the relevant SEC regulations for RIAs, FTC guidance, and other relevant industry standards.

117.    Mercer's data security failings enabled the Data Breach. Without these basic protections, cybercriminals were able to access and exfiltrate Plaintiffs' and Class members' PII.

118.    Mercer, through these data security failings, breached its express representations in its Privacy Policy detailed above.

119.    Alternatively, Mercer breached implied commitments to protect the PII of its customers and employees, including Plaintiffs and Class members, by virtue of mandating that customers and employees provide their sensitive PII as a condition of using or purchasing Mercer's products and services and/or being employed by Mercer.

120.    Mercer's basic data security shortcomings also constitute a breach of its duty of care to protect the PII of customers and employees, including Plaintiffs and Class members.

121.    Mercer's data security failings also constitute an unfair trade practice. As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of PII violates the FTC Act's prohibition on "unfair and deceptive acts."

36

122.    Mercer's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiffs and Class members.

123.    Mercer is liable for the injuries suffered by Plaintiffs and Class members by virtue of its role in the collection, transfer of and storage of the data of its affected customers.

124.    The Data Breach's disclosure of Plaintiffs' and Class members' PII has created a substantial risk that their data will be misused. That cybercriminals now control that data demonstrates this risk.

125.    Plaintiffs and Class members have and will continue to suffer the following forms of injury fairly traceable to the Data Breach.

126.    Plaintiffs and Class members have and will continue to reasonably expend significant time and costs mitigating the substantial risk of data misuse. These mitigation steps include Plaintiffs and Class members now expending time and effort to place "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

127.    Plaintiffs and Class members have and may suffer lost property value of their PII when Mercer allowed their PII to fall into the hands of cybercriminals, who could—and likely will—freely sell or distribute it at any time.

37

128.    Mercer breached its express and implied contractual commitments to Plaintiffs and Class members to protect their PII.

129.    The breach of a contractual obligation constitutes an injury to Plaintiffs and Class members and provides a basis for a lawsuit to enforce the contractual terms.

130.    In breaching its contractual commitments, Mercer further injured Plaintiffs and Class members by depriving them of the benefit of the bargain they had reached.

131.    For example, Plaintiffs and Class members entered into agreements with Mercer based on express and implied representations that their PII would be protected—which they factored into the value of that exchange. By failing to maintain reasonable data security measures to protect that PII, Mercer deprived Plaintiffs and Class members of the benefit of the bargain by which it owed the value of reasonable data security measures that were not provided.

132.    Plaintiffs and Class members have or may have been injured by an invasion of their privacy rights. The disclosure of their PII to cybercriminals and potentially others if and when the cybercriminals disclose it on the dark web involves PII whose private nature was compromised by the Data Breach.

133.    In addition, Plaintiffs and Class members have or may suffer emotional distress and anxiety resulting from the Data Breach and fear the substantial risk of

38

identity theft and loss of privacy. Plaintiffs and Class Members understand that their PII cannot now be clawed back from the dark web.

### K. Mercer's Inadequate Response to the Data Breach

134.   On or about February 25, 2026, Mercer began informing impacted individuals via email whose data had been compromised.

135.   Beginning on March 31, 2026, Mercer began sending notifications by mail to individuals and, where required, notices to state regulators.

136.   Upon information and belief, Mercer has sent notifications to the attorneys general of California, Massachusetts, Nebraska, Vermont, and Texas.

137.   From the limited data provided by Mercer, it is clear that thousands of its customers were impacted. For example, according to the Texas Attorney General, over 15,000 Texas residents' data has been compromised.

138.   However, the dates of these notifications appear to violate various state statutes regarding the required timing of the disclosures.

139.   For example, Texas requires that "businesses and organizations that experience a data breach of system security that affects 250 or more Texans to report that breach to the Office of the Texas Attorney General as soon as practicably possible and no later than 30 days after the discovery of the breach."[44] But according

---

[44] See *Data Breach Reporting*, Attorney General of Texas, *available at* https://www.texasattorneygeneral.gov/consumer-protection/data-breach-reporting

to the state's data breach reporting system, Mercer did not report its Data Breach to the state until April 2, 2026—well after the 30-day deadline.

140. Moreover, to date, Mercer has *still* not made clear the scope of the Data Breach, nor what *specific* information was accessed for each individual. Mercer did not inform any individuals exactly what information had been accessed.

### L. Plaintiffs' Experiences

#### a. Plaintiff Berger's Experience

141. Plaintiff Paul Berger is a customer of Mercer financial planning and investment services through the Paul Berger Revocable Trust (collectively referred to as Plaintiff Berger).

142. To utilize Mercer's products and services, Plaintiff Berger was required to entrust Mercer with his PII.

143. Upon information and belief Plaintiff Berger's PII was stolen from Mercer's systems, networks, and/or software in the Data Breach.

144. Mercer possessed Plaintiff Berger's PII before, during, and after the Data Breach.

145. On February 25, 2026, Plaintiff Berger received notice from Mercer that it had recently identified unauthorized access to some of its systems used to store client data and to be cautious of unsolicited emails or phone calls that ask for personal information or ask you to send money.

40

146.    Plaintiff Berger subsequently received a letter from Mercer dated March 31, 2026 stating that "an unauthorized third party obtained certain of your personal information." Mercer stated that the information could include name, contact information, Social Security number, drivers' license or passport number, date of birth, and/or account number. Mercer did not inform Plaintiff Berger which of his information had been "obtained," but rather stated only that "affected information varied by individual" and that "not all of [the] information was affected for every individual."

147.    Because of the Data Breach, Plaintiff Berger's confidential PII is now in the hands of cybercriminals. As such, Plaintiff Berger and other Class members are at imminent risk of identity theft and fraud.

148.    Following the Data Breach, Plaintiff Berger received numerous Financial Shield Dark Web Monitoring Alerts notifying him that his valuable PII was found on the Dark Web, including Plaintiff Berger's first and last name, street address and city, email address, password, email domain, telephone number, and Social Security number. Financial Shield attributed the appearance of this information on the Dark Web to the Mercer Data Breach.

149.    As a result of the Data Breach, Plaintiff Berger must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the

Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

150. Plaintiff Berger places significant value on the security of his PII and does not readily disclose it. Plaintiff Berger has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

151. Plaintiff Berger has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach.

152. Plaintiff Berger has a continuing interest in ensuring that his PII— which, upon information and belief, remains in the possession of Mercer—is protected, and safeguarded from future data breaches. Absent court intervention, Plaintiff Berger's and Class members' PII will be wholly unprotected and at-risk of future data breaches.

153. Plaintiff Berger suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains

backed up in Mercer' possession and is subject to further unauthorized disclosures so long as Mercer fails to undertake appropriate and adequate measures to protect his PII.

154.    The Data Breach caused Plaintiff Berger to suffer fear, anxiety, and stress, which has been compounded by the fact that Mercer has still not informed him of key details about the Data Breach.

### b.  Plaintiff Amick's Experience

155.    Plaintiff Amick is a customer of Mercer financial planning and investment services.

156.    To utilize Mercer's products and services, Plaintiff Amick was required to entrust Mercer with his PII.

157.    Upon information and belief Plaintiff Amick's PII was stolen from Mercer's systems, networks, and/or software in the Data Breach.

158.    Mercer possessed Plaintiff Amick's PII before, during, and after the Data Breach.

159.    On February 25, 2026, Plaintiff Amick received email notice from Mercer that it had recently identified unauthorized access to some of its systems used to store client data and to be cautious of unsolicited emails or phone calls that ask for personal information or ask you to send money.

160.    On February 25, 2026, Plaintiff received email notice from Mercer that it had recently identified unauthorized access to some of its systems used to store

client data and to be cautious of unsolicited emails or phone calls that ask for personal information or ask you to send money.

161.    Because of the Data Breach, Plaintiff Amick's confidential PII is now in the hands of cybercriminals. As such, Plaintiff Amick and other Class members are at imminent risk of identity theft and fraud.

162.    As a result of the Data Breach, Plaintiff Amick must expend hours of his time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

163.    Plaintiff Amick places significant value on the security of his PII and does not readily disclose it. Plaintiff Amick has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Amick has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach.

164.    Plaintiff Amick has a continuing interest in ensuring that his PII— which, upon information and belief, remains in the possession of Mercer—is protected, and safeguarded from future data breaches. Absent court intervention,

44

Plaintiff Amick's and Class members' PII will be wholly unprotected and at-risk of future data breaches.

165.    Plaintiff Amick suffered actual injury as a result of the unauthorized access and disclosure of his PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of his PII; (iii) lost or diminished value of his PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Mercer' possession and is subject to further unauthorized disclosures so long as Mercer fails to undertake appropriate and adequate measures to protect his PII.

166.    The Data Breach caused Plaintiff Amick to suffer fear, anxiety, and stress, which has been compounded by the fact that Mercer has still not informed him of key details about the Data Breach.

### c.    Plaintiff Moses's Experience

167.    Plaintiff Moses is a customer of Mercer financial planning and investment services.

168.    To utilize Mercer's products and services, Plaintiff Moses was required to entrust Mercer with her PII.

169.    Upon information and belief Plaintiff Moses's PII was stolen from Mercer's systems, networks, and/or software in the Data Breach.

170.    Mercer possessed Plaintiff Moses's PII before, during, and after the Data Breach.

171.    On or about March 31, 2026, Plaintiff Moses received a letter from Mercer stating that "an unauthorized third party obtained certain of your personal information." Mercer stated that the information could include name, contact information, Social Security number, drivers' license or passport number, date of birth, and/or account number. Mercer did not inform Plaintiff Moses which of her information had been "obtained," but rather stated only that "affected information varied by individual" and that "not all of [the] information was affected for every individual."

172.    Because of the Data Breach, Plaintiff Moses's confidential PII is now in the hands of cybercriminals. As such, Plaintiff Moses and other Class members are at imminent risk of identity theft and fraud.

173.    After receiving notice of the Data Breach, Plaintiff Moses attempted on multiple occasions to contact Mercer to determine what information of hers had been accessed and to discuss the scope of the Data Breach. Her efforts were unsuccessful, as she was repeatedly directed to the voicemail of a Mercer employee with whom she was unfamiliar.

174.    Unable to obtain any information from Mercer regarding the theft of her valuable personal information, and concerned for the continued security and integrity of the information she had entrusted to Mercer, Plaintiff Moses placed a credit freeze on her accounts through Experian, which remains in effect through the present.

175.    As a result of the Data Breach, Plaintiff Moses must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

176.    Plaintiff Moses has spent approximately **1-2 hours a week** responding to the Data Breach by, among other things, monitoring her accounts and credit reports regularly, instituting a credit freeze, researching the Data Breach, and attempting to contact Mercer.

177.    Plaintiff Moses places significant value on the security of her PII and does not readily disclose it. Plaintiff Moses has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Moses has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach.

178.  Plaintiff Moses has a continuing interest in ensuring that her PII—which, upon information and belief, remains in the possession of Mercer—is protected, and safeguarded from future data breaches. Absent court intervention, Plaintiff Moses's and Class members' PII will be wholly unprotected and at-risk of future data breaches.

179.  Plaintiff Moses suffered actual injury as a result of the unauthorized access and disclosure of her PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Mercer' possession and is subject to further unauthorized disclosures so long as Mercer fails to undertake appropriate and adequate measures to protect her PII.

180.  The Data Breach caused Plaintiff Moses to suffer fear, anxiety, and stress, which has been compounded by the fact that Mercer has still not informed her of key details about the Data Breach.

### d. Plaintiff Johnson's Experience

181.   Plaintiff Johnson was, at all relevant times to this Data Breach, a customer of Mercer Global Advisors Inc.'s financial planning and investment services.

182.   To utilize Mercer Global Advisors Inc.'s products and services, Plaintiff Johnson was required to entrust Mercer with her PII.

183.   On or about February 25, 2026, Plaintiff Johnson received email notice stating that the email was from Mercer Global Advisors Inc., and that it had recently identified unauthorized access to some of its systems used to store client data and to be cautious of unsolicited emails or phone calls that ask for personal information or ask you to send money.[45]

184.   Plaintiff Johnson subsequently received a letter entitled "Notice of Data Breach," signed by "Mercer Advisors," dated March 31, 2026, stating that "an unauthorized third party obtained certain of your personal information." Mercer stated that the information could include name, contact information, Social Security number, drivers' license or passport number, date of birth, and/or account number. The letter entitled "Notice of Data Breach," signed by "Mercer Advisors," dated

---

[45] In addition to stating that "[t]his email was sent by from Mercer Global Advisors Inc.," the email notice stated that "'Mercer Advisors' is a brand name used by several affiliated legal entities owned by Mercer Advisors, Inc., including, Mercer Global Advisors, Inc., an SEC registered investment adviser; Mercer Advisors Private Asset Management, Inc., an SEC registered investment adviser; Mercer Advisors Tax Services LLC; and Mercer Advisors Insurance Services LLC."

March 31, 2026  did not inform Plaintiff Johnson which of her information had been "obtained," but rather stated only that "affected information varied by individual" and that "not all of [the] information was affected for every individual." An exemplar of the letter entitled "Notice of Data Breach," signed by "Mercer Advisors," dated March 31, 2026 that was received by Plaintiff Johnson was submitted to the Attorney General of the State of California.

185.    Based upon the foregoing, Plaintiff Johnson alleges upon information and belief that Plaintiff Johnson's PII was stolen from Mercer's systems, networks, and/or software in the Data Breach.

186.    Based upon the foregoing, Plaintiff Johnson alleges upon information and belief that Mercer possessed Plaintiff Johnson's PII before, during, and after the Data Breach.

187.    Because of the Data Breach, Plaintiff Johnson's confidential PII is now in the hands of cybercriminals. As such, Plaintiff Johnson and other Class members are at imminent risk of identity theft and fraud.

188.    Following the Data Breach, Plaintiff Johnson received a voicemail from an individual claiming to represent "US Bank," an entity with which she is unfamiliar and has had no prior contact. She also received text messages purporting to be from US Bank regarding login activity from an unfamiliar location, prompting her to confirm her identity. After Plaintiff Johnson responded that she did not

recognize the activity, she began receiving spam telephone calls from an unknown and unidentified number.

189.    Plaintiff Johnson has also received numerous telephone calls and voicemails, subsequent to the Date Breach, regarding business loans that she did not request.

190.    Plaintiff Johnson was also notified by Google that someone was attempting to recover a nonexistent Gmail account with an address that combined Plaintiff Johnson's first name and the Gmail address of her husband.

191.    In response to this repeated fraudulent activity and attempts of identity theft resulting from the Data Breach, Plaintiff Johnson has terminated her relationship with Mercer and is in the process of transferring the assets previously managed by Mercer to a different advisor.

192.    As a result of the Data Breach, Plaintiff Johnson must expend hours of her time and suffer loss of productivity addressing and attempting to ameliorate and mitigate the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

193.    To date, Plaintiff Johnson has spent approximately 6 hours responding to the Data Breach, by, among other things, checking bank accounts and credit card statements regularly, signing up for credit monitoring and reviewing notifications

received from Credit Karma and Transunion, and transferring her account to a new advisor.

194.    Plaintiff Johnson places significant value on the security of her PII and does not readily disclose it. Plaintiff Johnson has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Johnson has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach.

195.    Plaintiff Johnson has a continuing interest in ensuring that her PII—which, upon information and belief, remains in the possession of Mercer—is protected, and safeguarded from future data breaches. Absent court intervention, Plaintiff Johnson's and Class members' PII will be wholly unprotected and at-risk of future data breaches.

196.    Plaintiff Johnson suffered actual injury as a result of the unauthorized access and disclosure of her PII in the Data Breach including, but not limited to: (i) invasion of privacy; (ii) disclosure and/or theft of her PII; (iii) lost or diminished value of her PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains

backed up in Mercer' possession and is subject to further unauthorized disclosures so long as Mercer fails to undertake appropriate and adequate measures to protect her PII.

197.    The Data Breach caused Plaintiff Johnson to suffer fear, anxiety, and stress, which has been compounded by the fact that Mercer has still not informed her of key details about the Data Breach.

**M. Plaintiffs and Class Members Suffered Damages**

198.    Given the sensitivity of the PII involved in this Data Breach, Plaintiffs and Class members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Mercer has done nothing to compensate Plaintiffs or Class members for many of the injuries they have already suffered. Mercer has not demonstrated any efforts to prevent additional harm from befalling Plaintiffs and Class members as a result of the Data Breach.

199.    Plaintiffs and Class members have been damaged by the compromise of their Private Information in the Data Breach.

200.    Since learning of the Data Breach, Plaintiffs have spent time dealing with the impact of the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to work and/or recreation.

201.    Due to the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the

Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring his accounts for fraudulent activity.

202. Plaintiffs' and Class members' Private Information was compromised as a direct and proximate result of the Data Breach.

203. As a direct and proximate result of Mercer's conduct, Plaintiffs and Class members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

204. As a direct and proximate result of Mercer's conduct, Plaintiffs and Class members have been forced to spend time dealing with the effects of the Data Breach.

205. Plaintiffs and Class members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

206. Plaintiffs and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiffs' and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class members.

207. Plaintiffs and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

54

208. Plaintiffs and Class members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

209. Plaintiffs and Class members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiffs and Class members paid to Mercer was intended to be used by Mercer to fund adequate security of its computer system(s) and Plaintiffs' and Class Members' PII. Thus, Plaintiffs and Class members did not get what they paid for and agreed to.

210. Plaintiffs and Class members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

211. Plaintiffs and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

        a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

        b. Purchasing credit monitoring and identity theft prevention;

55

c.  Placing "freezes" and "alerts" with reporting agencies;

d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e.  Contacting financial institutions and closing or modifying financial accounts; and

f.  Closely reviewing and monitoring bank accounts, and credit reports for unauthorized activity for years to come.

212.  Moreover, Plaintiffs and Class members have an interest in ensuring that their PII, which is believed to remain in Mercer's possession, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

213.  Further, as a result of Mercer's conduct, Plaintiffs and Class members are forced to live with the anxiety that their PII—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

214.  As a direct and proximate result of Mercer's actions and inactions, Plaintiffs and Class members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

## V.    CLASS ACTION ALLEGATIONS

215.    Plaintiffs bring this nationwide class action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

216.    The Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach (the "Class").

217.    Plaintiffs further seek certification of the following state subclasses:

California Subclass: All individuals residing in California whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach.

North Carolina Subclass: All individuals residing in North Carolina whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach.

218.    Excluded from the proposed Class is Mercer, its subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Mercer has a controlling interest, the legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

219.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

220.    **Numerosity.** The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the

57

individual claims of the respective Class members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Mercer's records, including, but not limited to, the files implicated in the Data Breach. Upon information and belief, the Class, at minimum, comprises well over a million individuals.

221.    **Commonality.** This action involves questions of law and fact that are common to Plaintiffs and the Class members. Such common questions include, but are not limited to:

- whether and to what extent Mercer had a duty to protect the PII of Plaintiffs and Class members;

- whether Mercer was negligent in collecting and storing Plaintiffs' and Class members' PII;

- whether Mercer had duties not to disclose the PII of Plaintiffs and Class members to unauthorized third parties;

- whether Mercer took reasonable steps and measures to safeguard Plaintiffs' and Class members' PII;

- whether Mercer failed to adequately safeguard the PII of Plaintiffs and Class members;

- whether Mercer breached its duties to exercise reasonable care in handling Plaintiffs' and Class members' PII;

- whether Mercer failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

- whether Plaintiffs and Class members are entitled to damages as a result of Mercer's wrongful conduct; and

- whether Plaintiffs and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

222. **Typicality.** Plaintiffs' claims are typical of the claims of the Class members. The claims of Plaintiffs and Class members are based on the same legal theories and arise from the same failure by Mercer to safeguard their PII. Plaintiffs and Class members entrusted Mercer with their PII, and it was subsequently accessed by an unauthorized third party.

223. **Adequacy of Representation.** Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the other Class members Plaintiffs seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel have adequate financial means to vigorously pursue this action and ensure the interests of the proposed Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

224. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the proposed Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication,

economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

225.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Mercer's liability and the fact of damages is common to Plaintiffs and each member of the proposed Class. If Mercer breached its duties and released Plaintiffs' and Class members' PII, then Plaintiffs and each Class member suffered damages by that conduct.

226.    **Ascertainability:** Members of the proposed Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through Mercer's books and records.

## VI.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

227.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

228.    Mercer owed a duty under common law to Plaintiffs and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting,

and protecting their PII in Mercer's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

229. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Mercer's cloud-based systems to ensure that Plaintiffs' and Class members' PII in Mercer's possession was adequately secured and protected; (b) implementing processes that would detect a breach of Mercer's security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by Mercer's own security systems regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

230. Mercer's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

231. Mercer had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices on the part of Mercer. By collecting and storing valuable PII that is routinely targeted by criminals for unauthorized access, Mercer was obligated to act with reasonable care to protect against these foreseeable threats.

232. Mercer also owed a common law duty to Plaintiffs and Class members because its conduct created a foreseeable risk of harm to them. Mercer's conduct included its failure to adequately restrict access to its computer networks and/or servers that held individuals' PII.

233. Mercer also knew or should have known of the inherent risk in collecting and storing massive amounts of PII, the importance of implementing adequate data security measures to protect that PII, and the frequency of cyber-attacks, such as the Data Breach.

234. Mercer breached the duties owed to Plaintiffs and Class members and thus was negligent. Mercer breached these duties by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII.

235. But for Mercer's wrongful and negligent breach of its duties owed to Plaintiffs and Class members, their PII would not have been accessed, exfiltrated, and compromised by cybercriminals.

236.   As a direct and proximate result of Mercer's negligence, Plaintiffs and

Class members have suffered injuries including:

    a.    theft of their PII;

    b.    costs associated with requesting credit freezes;

    c.    costs associated with the detection and prevention of identity theft;

    d.    costs associated with purchasing credit monitoring and identity theft protection services;

    e.    lowered credit scores resulting from credit inquiries following fraudulent activities;

    f.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

    g.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    h.    damages to and diminution in value of their PII entrusted to Mercer with the mutual understanding that Mercer would safeguard Plaintiffs' and Class members' data against theft and not allow access and misuse of their data by others; and

    i.    continued risk of exposure to hackers and thieves of their PII, which remains in Mercer's possession and is subject to further breaches so long as Mercer fails to undertake appropriate and adequate measures to protect Plaintiffs and Class members.

237.   As a direct and proximate result of Mercer's negligence, including its

gross negligence, Plaintiffs and Class members are entitled to damages, including

compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

238. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

239. Various state statutes, including the California Consumer Privacy Act, the North Carolina Unfair and Deceptive Trade Practices Act, the North Carolina Identity Theft Protection Act, impose specific, mandatory obligations on entities like Mercer to implement reasonable security procedures and practices to protect the personal information they collect and to provide timely and accurate notice in the event of a data breach. These statutes were enacted for the public's safety and to prevent the precise type of injury suffered by Plaintiffs and Class members as a result of the Data Breach.

240. Among other things, these statutes require covered entities to: (a) implement and maintain reasonable security procedures and practices appropriate to the nature of the information; and (b) in the event of a security breach, notify affected individuals without unreasonable delay after determining that a breach has occurred, so that individuals can take steps to protect themselves from identity theft and fraud.

241. Mercer violated these statutory duties by failing to implement and maintain reasonable security measures to protect Plaintiffs' and Class members' PII and by failing to provide timely and adequate notice of the Data Breach to Plaintiffs

64

and Class members after Mercer knew or reasonably should have known that their PII had been compromised.

242.    Plaintiffs and Class members are members of the class of persons that the above-described statutes were designed to protect, and the injuries they suffered—including the exposure of their PII, the increased and materialized risk of identity theft and fraud, the time and expense of mitigation efforts, and the other harms described herein—are the very types of harm that these statutes are intended to prevent.

243.    Mercer's statutory violations constitute negligence per se. As a direct and proximate result of Mercer's negligence per se, Plaintiffs and Class members have suffered injuries and damages in an amount to be determined at trial.

244.    As a direct and proximate result of Mercer's negligence, Plaintiffs and Class members have suffered injuries, including those identified in Paragraph 236 above.

245.    As a direct and proximate result of Mercer's negligence, Plaintiffs and Class members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

246.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

247.    Plaintiffs and Class members conferred a monetary benefit on Mercer by providing Mercer with their valuable PII.

248.    Mercer knew that Plaintiffs and Class members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Mercer profited from Plaintiffs' and Class members' PII and use of Plaintiff' and Class members' PII for its business purposes.

249.    As part of the advisory and related fees they paid, Plaintiffs and Class members reasonably expected, and Mercer represented that Mercer would invest in and maintain robust cybersecurity safeguards consistent with its obligations as a fiduciary investment adviser and as a custodian of highly sensitive PII. A portion of the fees Mercer charged, and the data Plaintiffs and Class members provided, functioned as a "security premium" intended to fund those safeguards.

250.    Rather than using that security premium to implement reasonable and appropriate data security measures, Mercer chose to under-invest in cybersecurity— by, among other things, failing to encrypt sensitive data, failing to implement multi-factor authentication, and failing to adequately monitor and segment its systems—in order to reduce its costs and increase its profits. Plaintiffs and Class

members thus paid, in whole or in part, for cybersecurity protections they never received, while Mercer retained the savings and additional profits generated by those under-investments.

251.    Mercer further benefitted from its use of Plaintiffs' and Class members' PII to grow and manage its client base, assets under management, and fee revenue, including by using PII to conduct marketing, advertising or promotional activities, and improving and developing its business, while failing to provide the level of security and confidentiality that Plaintiffs and Class members reasonably expected and were led to believe they would receive.

252.    It would be unjust for Mercer to retain the monetary benefits and cost savings it obtained from Plaintiffs and Class members under these circumstances, including the security premium and other profits attributable to Mercer's failure to provide reasonable data security, without providing commensurate compensation to Plaintiffs and Class members.

253.    Mercer failed to secure Plaintiffs' and Class members' PII and, therefore, did not fully compensate Plaintiff or Class members for the value that their PII provided.

254.    Mercer acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

255.    If Plaintiffs and Class members had known Mercer would not use adequate data security practices, procedures, and protocols to adequately monitor,

67

supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Mercer.

256. Under the circumstances, it would be unjust for Mercer to be permitted to retain any of the benefits that Plaintiffs and Class members conferred upon Mercer.

257. Plaintiffs and Class members are without an adequate remedy at law.

258. As a direct and proximate result of Mercer's conduct, Plaintiffs and Class members have suffered injuries, including those identified above.

259. Plaintiffs and Class members are entitled to restitution and/or damages from Mercer and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Mercer from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class members may seek restitution or compensation.

260. Plaintiffs and Class members plead their unjust enrichment claim in the alternative to their contract-based claims. To the extent the Court determines that no express or implied contract governs Mercer's data security obligations with respect to Plaintiffs' and Class members' PII, equity requires that Mercer disgorge the benefits and ill-gotten gains it retained as a result of its wrongful conduct.

## FOURTH CLAIM FOR RELIEF

### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

261. Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

262. Plaintiffs and the Class entrusted their Private Information to Mercer as a condition of purchasing products and obtaining services. In so doing, Plaintiffs and Class members entered into implied contracts with Mercer, pursuant to which Mercer agreed to safeguard and protect Plaintiffs' and Class members' Private Information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class members if their data had been breached, compromised, or stolen.

263. At the time Mercer acquired the Private Information of Plaintiffs and Class members, there was a meeting of the minds and a mutual understanding that Mercer would safeguard the Private Information and not take unjustified risks when storing the Private Information.

264. Implicit in the agreements between Plaintiffs and Class members and Mercer was Mercer's obligation to: (a) use Plaintiffs' and Class members' Private Information for business purposes only; (b) take reasonable steps to safeguard their Private Information; (c) prevent unauthorized access and disclosure of the Private Information; (d) provide Plaintiffs and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information;

69

and (e) retain the Private Information only under conditions that kept such information secure and confidential.

265.    Mercer's own Privacy Policy and client-facing disclosures expressly represented that Mercer "maintains physical, electronic, and procedural safeguards" to protect clients' personal information and that it restricts access to such information to those employees and vendors who need it to provide services. These and similar representations, including those on Mercer's website and account-opening materials, formed part of the context and circumstances giving rise to the implied contracts between Mercer and Plaintiffs and Class members and further confirm that reasonable data security and confidentiality were fundamental terms of those implied contracts.

266.    Plaintiffs and Class members reasonably expected, and Mercer knew or should have known, that they would not have entrusted their PII to Mercer—nor paid Mercer's advisory and related fees—had they been told that Mercer would fail to implement reasonable security safeguards, fail to encrypt sensitive data, fail to timely detect and contain the Data Breach, and fail to provide prompt, accurate notice of the compromise of their PII.

267.    Plaintiffs and Class members fully performed their obligations under the implied contracts with Mercer.

268.    Mercer breached the implied contracts it made with Plaintiffs and Class members by failing to safeguard and protect their Private Information, by

failing to delete the information of Plaintiffs and Class members once the relationship ended, and by failing to provide timely and accurate notice to them that their Private Information had been compromised and stolen in the Data Breach.

269. As a direct and proximate result of Mercer's above-described breach of implied contract, Plaintiffs and Class members have already suffered, and will continue to suffer, damages including, *inter alia*: (i) invasion of privacy; (ii) theft of their Private Information; (iii) actual and attempted misuse of the Private Information stolen in the Data Breach, including an increase in spam and phishing calls, texts, and emails; (iv) lost time, money, and opportunity costs associated with attempts to mitigate the actual consequences of the Data Breach; (v) lost or diminished value of their Private Information; (vi) loss of the benefit of their bargain; (vii) nominal damages; and (viii) the increased and continuing risk to their Private Information, which: (a) remains unencrypted and vulnerable to unauthorized access and abuse; and (b) remains backed up in Mercer's possession and is subject to further unauthorized disclosures so long as Mercer fails to undertake appropriate and adequate measures to protect the Private Information.

270. Plaintiffs and Class members have suffered (and will continue to suffer): an ongoing and imminent threat of future identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual and attempted identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of their stolen Private Information; the illegal sale of the

compromised data on the Dark Web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, lost work time; and other economic and non-economic harm.

271.    As a direct and proximate result of Mercer's above-described breach of implied contract, Plaintiffs and Class members are entitled to recover actual, consequential, and nominal damages to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the Class)

272.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

273.    Mercer acts as a fiduciary to Plaintiffs and Class members by virtue of its role as an investment adviser and wealth manager entrusted with managing clients' financial affairs and with obtaining, maintaining, and using highly sensitive personal and financial information about them. Plaintiffs and Class members placed special trust and confidence in Mercer to act in their best interests and to safeguard their confidential PII from unauthorized access, disclosure, and misuse.

274.    As a fiduciary, Mercer owed Plaintiffs and Class members duties of loyalty, care, and confidentiality, including the duties to: (a) safeguard their PII using reasonable and appropriate security measures; (b) refrain from placing its own interests, including cost savings and profit, ahead of clients' privacy and security;

72

and (c) promptly inform Plaintiffs and Class members of material risks to their PII, including security incidents and breaches.

275.    Mercer breached its fiduciary duties by, among other things: (a) failing to implement reasonable cybersecurity measures; (b) failing to adequately monitor and secure its networks and systems; (c) failing to timely detect and contain the Data Breach; (d) failing to timely and fully disclose the Data Breach and its scope to Plaintiffs and Class members; and (e) prioritizing cost savings and profits over the privacy and security of Plaintiffs' and Class members' PII.

276.    As a direct and proximate result of Mercer's breaches of its fiduciary duties, Plaintiffs and Class members suffered the injuries and damages described herein, including exposure of their PII, increased and materialized risk of identity theft and fraud, time and money spent on mitigation, loss of privacy, emotional distress, and other harms, in amounts to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA
### CONSUMER PRIVACY ACT ("CCPA")
### Cal. Civil Code Sec. 1798.150, *et seq.*

### (On Behalf of Plaintiffs Amick, and Johnson, and the California Subclass)

277.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

278.   This claim is alleged on behalf of Plaintiffs Amick and Johnson (referred to as "Plaintiffs" throughout this claim) and on behalf of the California Subclass (referred to as "California Subclass members" throughout this claim).

279.   The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA.

280.   Section 1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

> i   To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.

> ii   Injunctive or declaratory relief.

> iii  Any other relief that court deems proper.

281.   Defendants are each a "business" under § 1798.140(b) in they are each a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

282.   Plaintiffs and California Subclass members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

283.   The personal information of Plaintiffs and the California Subclass members at issue in this lawsuit constitutes "personal information" under §

1798.150(a) and 1798.81.5, in that the personal information Mercer collects and which was impacted by the cybersecurity attack includes an individual's PII.

284. Mercer knew or should have known that its computer systems and data security practices were inadequate to safeguard the Plaintiffs' and California Subclass members' personal information and that the risk of a data breach or theft was highly likely. Mercer failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiffs and the California Subclass members. Specifically, Mercer subjected Plaintiffs' and the California Subclass members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

285. As a direct and proximate result of Mercer's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and California Subclass members' personal information included exfiltration, theft, or disclosure through Mercer's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

286. As a direct and proximate result of Mercer's acts, Plaintiffs and California Subclass members were injured and lost money or property, including but not limited to the loss of Plaintiffs' and California Subclass members' legally

75

protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

287.    Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

288.    Accordingly, Plaintiffs and the California Subclass members, by way of this complaint, seek actual pecuniary damages suffered as a result of Mercer's violations described herein.

289.    Plaintiff Amick provided Mercer with written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1), on March 6, 2026.   Mercer responded to Plaintiff Amick's CCPA notice letter in writing on April 20, 2026.

290.    Plaintiff Johnson provided Mercer Advisors, Inc. with written notice of its violations of the CCPA, on April 14, 2026. Mercer Advisors, Inc.  responded to Plaintiff Johnson's CCPA notice letter in writing on April 20, 2026.

### SEVENTH CLAIM FOR RELIEF

**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT (UDTPA)
N.C. Gen. Stat. § 75-1.1, *et seq.***

**VIOLATIONS OF THE NORTH CAROLINA IDENTITY THEFT
PROTECTION ACT ("NCITPA")
N.C. Gen. Stat. § 75-60 *et seq.***

**(On Behalf of Plaintiff Moses and the North Carolina Subclass)**

291.    Plaintiffs restate and reallege all preceding factual allegations above as if fully set forth herein.

292.    This claim is alleged on behalf of Plaintiff Moses (referred to as "Plaintiff" throughout this claim) and on behalf of the North Carolina Subclass (referred to as "North Carolina Subclass members" throughout this claim).

293.    Defendants are each a "business" within the meaning of N.C. Gen. Stat. § 75-61(1), in that they each conduct business in North Carolina and own, license, and/or maintain personal information of North Carolina residents.

294.    Defendants are each engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1.

295.    At all relevant times, Defendants collected, maintained, stored, and used "personal information" as defined by N.C. Gen. Stat. § 75-61(10), including, *inter alia*, names in combination with Social Security numbers, financial account information, and/or other sensitive identifying data.

296.    Pursuant to the NCITPA, Defendants were required to, among other things, implement and maintain reasonable security procedures and practices appropriate to the nature and sensitivity of the PII, protect such information from unauthorized access, acquisition, destruction, use, modification, or disclosure, and provide timely, accurate, and adequate notice in the event of a security breach.

297.    Defendants violated the NCITPA by failing to implement reasonable administrative, technical, and physical safeguards to protect Plaintiff's and North Carolina Subclass members' personal information. These failures included, inter alia, deficiencies in one or more of the following areas: access controls, data

77

encryption, system monitoring, vulnerability management, and/or employee training.

298. As a direct result of these deficiencies, Defendants' systems were vulnerable to unauthorized access and were in fact compromised in a ransomware attack perpetrated by unauthorized third parties.

299. The exfiltrated data included highly sensitive personal information, including, inter alia, Social Security numbers, financial account information, and other identifiers that can be used to commit identity theft and fraud.

300. Defendants also failed to provide timely, accurate, and adequate notice of the Data Breach, as required by N.C. Gen. Stat. § 75-65.

301. Defendants' conduct, as alleged herein, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, and offends established public policy, including that embodied in the NCITPA.

302. As a result of the foregoing, Defendants violated the NCITPA.

303. Defendants' violations of the NCITPA constitute unfair and deceptive acts or practices in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1 (UDTPA).

304. Defendants further engaged in unfair and deceptive acts and practices by, among other things: (a) failing to implement reasonable and appropriate data security measures to safeguard Plaintiff's and North Carolina Subclass Members' PII despite the foreseeable and well-known risks of cyberattacks, including

ransomware attacks; (b) failing to adequately assess, identify, and remediate material vulnerabilities in their data security systems; and (c) omitting and concealing material facts regarding the inadequacy of their data security practices, which were not reasonably discoverable by Plaintiff and North Carolina Subclass members.

305. Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of Plaintiff's and North Carolina Subclass members' PII.

306. Plaintiff and North Carolina Subclass members reasonably relied on Defendants' omissions and representations in providing their PII to Defendants and would not have provided such information in connection with their interactions with Defendants, or would have taken steps to protect themselves, had they known the true nature of Defendants' data security practices.

307. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and North Carolina Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

308.    Plaintiff and North Carolina Subclass members are entitled to recover all available remedies under N.C. Gen. Stat. § 75-16, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

A.    For an order certifying the proposed Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes and Plaintiffs' attorneys as Class Counsel to represent the Classes;

B.    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

C.    For damages in an amount to be determined by the trier of fact;

D.    For an order of restitution and all other forms of equitable monetary relief;

E.    Declaratory and injunctive relief as described herein;

F.    Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses;

G.    Awarding pre- and post-judgment interest on any amounts awarded; and

H.    Awarding such other and further relief as may be just and proper.

## VIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: May 4, 2026                     Respectfully submitted,


 */s/ Eric Olson*
Eric Olson *(he/him/his)*
**OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: 303-535-9155
Email: eolson@olsongrimsley.com

*Interim Liaison Counsel*

Gary M. Klinger (*he/him/his*)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com


James J. Pizzirusso (*he/him/his*)
Nicholas U. Murphy (*he/him/his*) *
Kira Hessekiel (s*he/her/hers*) *
**HAUSFELD LLP**
1200 17th Street, NW, Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
Email: jpizirusso@hausfeld.com
Email: nmurphy@hausfeld.com
Email: khessekiel@hausfeld.com

Steven M. Nathan (*he/him/his*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
Telephone: (646) 357-1100
Email: snathan@hausfeld.com

Linda P. Nussbaum (s*he/her/hers*)
**NUSSBAUM LAW GROUP, P.C.**
1225 Franklin Avenue, Suite 325
Garden City, NY 11530
Telephone: (917) 438-9189
Email: lnussbaum@nussbaumpc.com

*Interim Class Counsel for Plaintiffs and
the Proposed Class*

*\*Admission forthcoming*